J. and H. SEYMOUR *against* BROWN and others.

The plaintiff sent to the defendant, a miller, a quantity of wheat, to be exchanged for flour, at the rate of a barrel of flour for every five bushels of wheat. The defendant mixed the plaintiff's wheat with the mass of wheat of the same quality, belonging to himself and others; but before the flour was delivered to the plaintiff, the mill of the defendant, with all its contents, wheat and flour, was entirely destroyed by fire, from some unknown cause, and without any fault or negligence on the part of the defendant: *Held*, that the defendant was not responsible for the loss of the plaintiff's wheat, there being no contract of sale by which the property was transferred to the defendant.

THIS was an action of *assumpsit*, tried before Mr. Justice *Van Ness*, at the *Genesee* circuit, on the 6th of *June*, 1820. A verdict was taken for the plaintiff, subject to the opinion of the Court on a case made. The declaration contained a count on a special agreement, and, also, the general counts.

The first count stated a special agreement, by which the defendants, who were millers, agreed, that for so much wheat, of the first quality, as the plaintiffs should deliver to the defendants, at their grist mill in *Genesee*, the defendants would deliver, in exchange therefor, at their said mill, to the plaintiffs, one barrel of fine flour fit for market, for every five bushels of wheat of the first quality, delivered to them,. &c. And the plaintiff averred a delivery of 600 bushels of wheat, &c.

At the trial, the plaintiffs gave in evidence the receipts of the defendants for 280 bushels of wheat of the first quality, in *March*, 1818. It was proved, that the wheat of the plaintiffs was thrown in bulk into large bins, and mixed with other wheat which the defendants had purchased for account of other persons, and received for other customers ; and that no flour was packed, marked, and set apart for the plaintiffs, when the mill of the defendants, with all its contents, being several thousand bushels of wheat, and about 70 barrels of flour, was destroyed by fire, on the 2d of *May*, 1818, without any negligence or fault of the defendants, and from some cause unknown. The agreement between the parties was proved by letters which passed between them. On the 1st of *December*, 1817, the plaintiffs addressed a letter to the defendants, in which they say, " we shall have, during the ensuing winter, a quantity of wheat which we shall want to sell, or get floured, and wish to know on what terms you would do it for us, either exchanging flour for wheat, or grinding it at a certain price per barrel. We may send a small quantity before sleighing, which we wish to

exchange." On the 2d of *December*, 1817, the defendants answered as follows : " Yours of the date, *December* 1st, is received. In answer, we state, that our terms in milling, are : We receive first quality wheat, and deliver, fit for market, one barrel of fine flour for five bushels ; and for inferior qualities of wheat, one shilling deduction, which is either to be paid in wheat or cash, at our employer's option. We also grind for toll, charging one shilling per barrel for packing. We can always exchange, at a short notice, flour for wheat, on the above terms." On the 13th of *December*, 1817, the plaintiffs wrote to the defendants, as follows : " We send you a load of wheat which we shall wish to exchange for flour. The flour we shall send for in a few days, by a teamster going to *Albany*."

On the 12th of *August*, 1818, the plaintiffs drew an order on the defendants, to wit, for " forty-seven barrels of flour, being the balance due us for wheat sold you last winter." This order was presented to the defendants, who refused to deliver the flour, assigning as a reason, that their mill, storehouse, &c. with all the contents, wheat and flour, had been destroyed by fire, originating from some unknown cause. They observed, that previous to the fire, they had flour on hand, which they could have delivered to the plaintiffs, if it had been demanded.

*Talcot*, for the plaintiffs, contended, that as the defendants, instead of keeping the wheat sent by the plaintiffs, separate and distinct, had mixed it with their own wheat, or with that of other persons, it was unlike the common case of sending wheat to a miller to be ground into flour. That it was to be deemed a contract of sale, or exchange, of so much wheat, for so much flour ; and, therefore, the wheat, after its delivery, was not at the risk of the plaintiffs, but of the defendants. He cited 2 *Johns. Rep.* 13. 2 *Comyn on Contr.* 212. *Jones on Bailment*, 90. *Pothier, Traité du Contrat de Vente*, part. 4. n. 307.

To show that the plaintiff might abandon the count on the special agreement, and recover on the general count for goods sold and delivered, &c. he cited, 1 *Term Rep.* 133. 1 *Bos. & Pull.* 354. 1 *Hen. Bl.* 287. 1 *Chitty Pl.* 338,

339.   7 *Johns. Rep.* 132.   10 *Johns. Rep.* 36.   12 *Johns. Rep.* 274.   13 *Johns. Rep.* 94.   14 *Johns. Rep.* 326.

*E. Clark,* contra.

SPENCER, Ch. J. delivered the opinion of the Court. (After stating the facts.) The question, upon this state of facts, is, on whom is the loss to fall ; it being proved that the defendants were not guilty of any negligence in regard to the burning of the mill and store ; and that there was no default in delivering flour according to the contract, until after the destruction of the mill.

It cannot, with any kind of propriety, be asserted, that these facts show a sale of the wheat to the defendants. On the contrary, it is manifest, that no sale was ever contemplated by either of the parties. If the defendants had kept this wheat specifically, by itself, there would have been no ground for saying, that they were liable for the loss. The general law of bailment was very ably discussed by Lord *Holt,* in *Coggs* v. *Barnard;* (2 *Ld. Ray.* 909.) and although his general division of bailments is imperfect, as respects the delivery of goods to a tradesman or manufacturer to operate upon ; yet in all his divisions, he does not consider a bailee responsible for inevitable accident, unless he be a person exercising a public employment ; such as a common carrier, common hoyman, master of a ship, an innkeeper, &c. These are bound to answer for the goods, at all events, except where the loss is attributable to the act of God, or the enemies of the king. This, he considers truly, to be a politic establishment, contrived by the policy of the law, for the safety of all persons, the necessity of whose affairs oblige them to trust these sorts of persons, that they may be safe in their ways of dealing. Sir *William Jones,* in his treatise on bailment, has altered the arrangement of Lord *Holt's* division of bailments, and has reduced his six kinds to five, which he has rendered more definite and comprehensive. His fifth class is *Locatum,* or a hiring, which, he says, is always for a reward. He subdivides the *Locatum* into, 1st. *Locatio rei* by which the hirer gains the temporary use of the thing ; and 2d. *Locatio operis faciendi,* when work and la-

NEW-YORK,
May, 1821.

SEYMOUR
v,
BROWN.

bour, or care and pains, are to be performed or bestowed on the thing delivered; or, 3d. *Locatio operis mercium vehendarum*, where goods are bailed, for the purpose of being carried from place to place, either to a public carrier or a private person. With regard to the first, *Locatio conductio rei*, Sir *William Jones* correctly concludes, that the hirer is not bound to more than an *ordinary* degree of diligence; that is, such diligence as all prudent men use in keeping their own goods. As to the second, or *Locatio operis faciendi*, " If," he says, " *Titius* deliver silk or velvet to a tailor, for a suit of cloathes, or a gem to a jeweller to be set or engraved, or timber to a carpenter for the rafters of his house; the tailor, the engraver, and the builder, are not only obliged to perform their several undertakings, in a workmanly manner, but since they are entitled to a reward, either by express bargain, or by implication, they must also take ordinary care of the things respectively bailed to them :" and he proceeds to illustrate his position, by reference to cases, and concludes, that in whatever point of view this bailment be considered, no more is regularly demandable of the bailee than the care which every prudent man takes of his own property.

He says, " it may be right also to mention, that the distinction before taken, in regard to loans, between an obligation to restore the specific things, and a power or necessity of returning others of equal value, holds good likewise in the contrasts of hiring and depositing; in the first case, it is a regular bailment, in the second, it becomes a debt." He divides loans into those that are for use, and those that are for consumption. The first are to be returned specifically, and the owner must abide the loss, if they perish, through any accident which a careful and vigilant man could not have avoided. The second, such as lending wine, corn, and other things, which are to be restored in equal value or quantity ; as these specific things are not to be returned, the absolute property of them is transferred to the borrower, who must bear the loss, however inevitable the misfortune by which they are destroyed; and he cites the *Digest*, 19. 2. 31. and *Bynkershoeck, Obs. Jur. Rom. lib.* 8. commenting on what he calls the famous law of *Alfenus.* " If an ingot of silver be deli-

vered to a silversmith to make an urn, the whole property is transferred, and the employer is only a creditor of metal equally valuable, which the workman engages to pay in a certain shape." "The smith, (says Sir *W. Jones*) may consequently apply it to his own use, but if it perish, even by unavoidable mischance, or irresistible violence, he, as owner of it, must abide the loss, and the creditor must have his urn in due time. It would be otherwise, no doubt, if the same silver, on account of its peculiar fineness, or any uncommon metal according to the whim of the owner, were agreed to be specifically delivered in the form of a cup or standish." I am not aware of a case in the courts of common law, where a question like this has arisen; and it seems to me that the case cited and commented on by *Bynkershoeck*, if it be analogous, does not govern this case. It was not the intention of the parties here that the plaintiffs should sell and the defendants buy wheat, or that the defendants should sell and the plaintiffs buy flour. In other words, it was not the intention that the one should sell wheat for flour, and the other flour for wheat.

The object was, that as the plaintiffs had wheat which they wished to turn into flour, and as the defendants had a mill adapted to its manufacture, the plaintiffs should, for a certain quantity of wheat of a given kind, receive a certain quantity of flour of a particular kind. I have already observed, and Sir *William Jones* and all the cases justify the position, that if the same wheat delivered by the plaintiffs was to be manufactured for, and delivered to them, the defendants, clearly, would not have been responsible for the present loss. But the plaintiffs' wheat was mixed with other wheat belonging either to the defendants or other persons. I confess I do not see how that alters the case, unless we are to presume, without evidence, that it was mixed with an inferior quality of wheat. If it was put with wheat of exactly the same, or of a superior quality, the act was not injurious to the plaintiffs. Its indentity was destroyed, but that was entirely immaterial, if there yet remained wheat of the first quality. The plaintiffs expected that the identity was to be changed in the manufacture. I presume, that neither party contemplated that the plaintiffs' wheat was to be kept separate from other wheat of the

same quality; for it is no part of the contract that the flour to be delivered by the defendants, should be manufactured out of the plaintiff's identical wheat. The whole case shows, that there had been no default in delivering flour according to the contract; and why should the plaintiff's delay in calling for the flour be at the defendant's risk? It appears, too clearly, that a much larger quantity of wheat than was necessary to supply the plaintiffs with flour when manufactured, was in the mill when it was destroyed. I cannot consent to engraft the rule of the civil law, as stated by Sir *Wm. Jones*, into our code ; and as I perceive here no principles of law or justice to render the defendants liable, I think they should have judgment. I have not examined the technical objections, being satisfied on the main ground.

Judgment for the defendant.