ALBANY,
Oct. 1827.

Hurd
v.
West.

A delay of more than four years to bring ejectment, after notice to quit by a mortgagee to a mortgagor, is not a waiver of the notice. *Jackson ex dem. Beach* v. *Stafford,* 2 Cow. Rep. 547. The notice to quit by a mortgageee to a mortgagor, need not direct the mortgagor to quit on a day in the year corresponding with the date of the mortgage. Ib.

The mortgagor, in order to warrant ejectment against him, is not entitled to notice to quit, after foreclosure. At any rate, the advertisement of sale operates as a sufficient notice to quit. *Jackson ex dem. Walsh* v. *Colden,* 4 Cow. Rep. 266.

One who holds of a mortgagor, under a parol contract to purchase, is not entitled to a notice to quit. *Jackson ex dem. Roosevelt et al.* v. *Stackhouse,* 1 Cow. Rep. 122.

If the lessor allows the tenant to remain in possession seventeen years after the expiration of the lease, he cannot recover in ejectment, without notice to quit. *Bedford* v. *M'Elherron,* 2 Serg. & R. Rep. 49.

## HURD *against* WEST.

Where one delivers personal property to another, to be returned after a certain time; at the expiration of the term, the same identical property reverts to, and the title is in the bailor; and he may take it from one having a wrongful possession, without being liable to an action of trespass.

[*753] z

ON error from the court of C. P. of the county of Washington. The errors assigned were founded on exceptions taken at the trial in the court below, on the 4th of March, 1824; and which came here on a bill of exceptions presenting, in connection with the record, these facts: The action in the court below was trespass by West, against Hurd, for taking a number of sheep. The plaintiff *below proved on

Otherwise where the contract of the bailee is either in the alternative; to return the property bailed, or deliver property of the same kind and quality; or where the contract is to do the latter only. In either of these cases, the obligation on the part of the bailee rests in contract; and till he actually make the delivery, though the term has expired, the bailor has no vested interest in the property. The letting is not properly a bailment, but operates as a sale, and the right of the bailor is a chose in action only. And see note (a) to this case. Semb. *Seymour* v. *Brown,* (19 John. 44,) is overruled. Id.

But on the delivery of the identical property, or other property, to the bailor, in satisfaction of the contract, he has a vested interest in possession in the specific property delivered.

The declarations or admissions of a vendor of personal property, though made before sale, are not evidence against the vendee; but the vendor should be called as a witness.

Where a witness is interested against the party calling him, he is competent.

Possession, though tortious, is sufficient to maintain trespass against a stranger who divests such possession.

Where one, having possession of personal property, delivered it to another who claimed but had no right to it, upon his agreement to see L., and negotiate about the title, which, on obtaining possession, he refused to do, but claimed and used the property as his own; held, that trespass lay against him at the suit of the one from whom he so obtained the property

the trial, that on the 27th of March, 1822, he purchased 23 sheep of Gideon Dayton, and gave his note, which was immediately transferred by Dayton to Robert I. Law in part payment of a debt. At the time of purchase, the sheep were on a farm in Sandgate, which Law had bought of Daniel Dayton. The sheep were taken to the farm of the plaintiff below. John Stewart testified that none of them were more than two years old.

In April, 1822, the plaintiff below sold 18 of the sheep to K. West. While they were engaged in driving the sheep towards the village of Salem, the defendant below met them; and claimed the sheep as his property. K. West thereupon gave up his bargain with the plaintiff below; and it was then agreed between the plaintiff and defendant below, that the sheep should be taken back, and united with the other five which had been left on the farm; that the parties should call on Law; and that the defendant below should do something by which the plaintiff would not be the loser. The agreement between the plaintiff below and Dayton was, that the former should not pay for the sheep unless he could hold them. It also appeared that the plaintiff below forbade the defendant below taking the sheep. The defendant below, after proceeding part of the way to Law's, refused to go on; but took 5 sheep out of the barn of the plaintiff below; and drove them away together with the other 18.

The defendant below submitted to the court whether trespass would lie upon these facts; and moved for a nonsuit; which being overruled, he excepted.

The defendant below proved by Thompson Hurd, that in the year 1819 or 1820, in the fall, the defendant below let to Daniel Dayton of Sandgate, a number of sheep for one year, for a pound of wool a head; and was to have the same sheep, or sheep of as good quality, returned in case any died.

Daniel Dayton left the country about the time the plaintiff below purchased; shortly before which, the defendant below started to go to his house and settle with *him and get the sheep kept. Gideon Dayton moved into Daniel

[*754]

Dayton's house; but absconded about the 1st of April, 1822. The defendant below went for the sheep to Gideon Dayton's; found he had absconded, and hearing that the plaintiff below had purchased the sheep, he proceeded, and overtook the plaintiff below with the 18, on his way to Salem.

Shortly before Gideon Dayton made the sale, he informed S. Thomas that there were then on the farm in Sandgate, 23 sheep, which belonged to the defendant below: that they had formerly been let to Daniel Dayton; and that the defendant below had left them there to be kept for a short time. That if he concluded to go away, he meant to sell the sheep.

Alanson Hurd testified, that in 1820, the defendant below let to Daniel Dayton, 23 sheep, for one year; and when that year was ended, he let them for another year, for a pound of wool a head; and was to have the same number of sheep, and of as good quality returned.

A few weeks before Gideon Dayton absconded, he came to the house of the defendant below, and wished him to come and settle with him (D.) for keeping the sheep.

The court charged the jury, that unless they were satisfied, from the evidence, that the sheep sold by Gideon Dayton were the same identical sheep, which the defendant below formerly let to Daniel Dayton, the plaintiff below was entitled to recover. The defendant below excepted to the charge.

Verdict for the plaintiff below.

*J. Willard,* for the plaintiff in error. Trespass would not lie. West gave up the sheep to Hurd voluntarily. Even a refusal to deliver the sheep on demand, would not have entitled to the action. It would have been a bare non-feasance, for which trespass does not lie. (7 Com. Dig. Day's ed. Trespass, (D ;) 1 Ld. Raym. 188; 12 John. 348; 6 Cowen, 112.) There was no fraud in obtaining possession. West, in effect, admitted our right. *(3 Stark. Ev. 1444; 1 T. R. 480.) The sheep were given up under an agree-

[*755]

ment. If this was violated, the remedy should have been by assumpsit.

But the weight of testimony was decisive, that the property belonged to Hurd.

The court misdirected the jury. The question was, whether the sheep were Hurd's or West's. The question of identity was one of evidence; not of right. If the sheep were Hurd's, though not the same he first let to D. Dayton, he was entitled to hold them. The testimony showed that Hurd had taken the sheep back, or other sheep in lieu of them; and left them with G. Dayton a short time to be kept. The jury might well have believed the sheep to be Hurd's, though not the identical sheep let to Dayton.

*D. Russell*, contra. Trespass no doubt was the proper action. It is always so, where possession is delivered for one purpose; but abused to another. The right of possession in the plaintiff is sufficient.

The question of identity has been passed on by the jury, under a charge fairly submitting the question. The weight of evidence is not to be examined here; but if examined, will be found in favor of the plaintiff below.

There was no evidence on the trial, to warrant a belief that the sheep in question had been delivered by either of the Daytons to the defendant below. Nor was a pretence of that kind set up on the trial.

*Curia,* per WOODWORTH, J. There was no well founded objection to the form of the action. The plaintiff did not consent to the taking, but forbade it. It is true, there is the appearance of a negotiation, commenced respecting the property, in which it was agreed to call on Law; but this was not carried into effect, by reason of the refusal of the defendant below. Thus the parties were left in the same situation as before the proposition was made. At most, it was only the incipient step towards an accommodation; and, of itself, was neither an acknowledgment of *right in the defendant below, nor permission to take. The decision of the court below on this point was not erroneous.

ALBANY,
Oct. 1827.

Hurd
v.
West.

[*756]

In order to test the correctness of the charge, it is necessary to examine the facts before the court, upon which it was given.

The plaintiff below was entitled to recover unless the defendant below made out a good title to the property taken. This will, in some measure, depend on the contract of letting. It seems to me, the first question was, whether the identical sheep, if they survived, were to be returned, or the same number of sheep, and of as good quality. In the first case the title would still have continued in the defendant below, with the right to assert it when the period of letting expired. There was no proof that any of the sheep died. If the terms of the letting were as in the second case, or in the alternative, the right of the defendant below rested in contract; for he was not authorized to claim the identical sheep. He had given Dayton the right of returning any other sheep of the same quality; and this right consequently allowed Daniel Dayton to dispose of the sheep let, and substitute others of the same quality. The defendant below was bound to make out property in the subject. A claim to be compensated by the delivery of 23 sheep, or damages, if that was omitted, will not suffice to justify the taking.(a) The jury were called on to *decide

[*757]

(a) This position goes upon a distinction in the law of bailments, which has been somewhat obscured by a recent decision. If the identical sheep were to have been returned, it was the simple case of the *locatio rio*, a kind of lease of personal property, at a rent, for a term, after which the property in the thing reverts, as it were, to the lessor.1 In such case the identical property belongs to the bailor, who may maintain trover for it, or detinue for the specific thing, as a reversioner may sue for the specific land after the term has expired. In such a case, if the bailee exercise ordinary care of the thing, he is not responsible though it perish. But it is otherwise in the second case put by judge Woodworth, where the bailee is to return another article of the same kind, or has an option to return the same or another. The property then passes; it is the case of sale or exchange; the original owner acquires a property in the price; while all his interest is gone in the specific thing; and no action will lie except assumpsit for the price, until the thing to be delivered in compensation, has been so delivered, or tendered. It is a case of payment; not a reversion. It is like *Barns* v. *Graham*, (4 Cowen, 452,) where Savage, Ch. J., has very aptly defined the rights and duties of the parties. I said this distinction was obscured by a late decision. I allude to *Seymour* v. *Brown and others*, (19 John. 44.) The defendants

what was the contract entered into between the defendant below and Daniel Dayton. The conclusion was to be drawn from conflicting evidence. If the sheep were to be the same before let, and the period for which they were let had expired, (about which the evidence was contradictory,) then it follows, that the plaintiff below was not entitled to recover. This part of the charge, however, cannot well be complained of by the defendant below; for it was more favorable to him than he had a right to expect. It will be recollected that Stewart testified none of the sheep were more than two years old. If *this be so, they could not be the same sheep let two years before; and if

agreed, that, for every 5 bushels of wheat the plaintiffs should deliver at the defendants' mill, they (the defendants) would deliver in exchange, one barrel of flour. The wheat delivered was consumed by fire, with the defendants' mill; and there being no negligence, they were holden not liable on their agreement to deliver the flour; the court deciding that it was a case of bailment, (*locatio operis faciendi.*) Among the very few errors of the court who decided that case, we may now, without incurring the imputation of arrogance, perhaps be warranted in pronouncing this one. It varies from the decision in the principal case, and stands opposed to Sir William Jones, the great oracle of the law of bailments. (See Jon. on Bailm. 2d ed. 102, whose doctrine is also correctly cited by Spencer, Ch. J., in *Seymour* v. *Brown,* 19 John. 47.) The doctrine of Jones will be found, in substance, precisely that of the principal case : that if the contract was, to return the same number of sheep; or if it was alternative, *i. e.* the same sheep or the same number; and not absolute to return the same sheep, there was the right of returning other sheep; Dayton might sell the identical sheep, and substitute others. Hence it is inferred that the property of the original owner had passed from him. Jones says, " It may also be proper to mention the distinction between an obligation to restore the specific things, and a power or necessity of returning others equal in value. In the first case, it is a regular bailment; in the second it becomes a debt." In the latter case, he considers the whole property transferred. I observe, also, that the late chancellor Kent, in his 2 Commentaries, 464, speaking of *Seymour* v. *Brown,* says, " the decision was not conformable to the true and settled doctrine." He adopts that of Jones. The opinion of the court in *Slaughter* v. *Green and others,* (1 Randolph, 3,) looks somewhat like supporting *Seymour* v. *Brown,* but the case was dissimilar. Written receipts were given for the wheat, to be ground; and the defendants' control over it was plainly qualified, though the custom of the country, in reference to which it was receipted, warranted the mixing of it with the wheat of others received on the like terms. The limitation in the receipt was considered by the court as importing a bailment, and not an exchange for flour.

Alanson Hurd stated the time of letting correctly as in 1820, the right of the defendant below had not accrued. Had the court stated to the jury the evidence bearing on the question of identity, and that going to show that even if these were the same sheep, it was not clear that the term of letting had not ended, I think the charge would have been more correct. As it is now, the mere identity is held to be sufficient, which might or might not be, depending on the view the jury should take of the evidence upon the points to which I have adverted. But it was the plaintiff below who with more propriety might object to this part of the charge. It is no ground for the defendant below to object. If erroneous, it was most favorable to him; and he had the benefit of it.

The residue of the charge is, substantially, that the plaintiff below was entitled to recover, if the sheep were not the same lot. This part is also correct, unless there is another question connected with it, and arising from the evidence, that ought to have been submitted to the jury, the finding of which favorably to the defendant below, would leave the question whether the sheep taken were the same or not, an immaterial inquiry.

I admit that, in considering this point, it is unimportant whether the contract was to return the identical sheep, or others of the same quality; for, in either case, the defendant below had no right to them. It was, however, competent for Daniel Dayton to return, and for the defendant below to accept any sheep in satisfaction of the contract. Is there any evidence bearing on this point sufficient to go to the jury? If there is, their attention should have been called to it; for it cannot be doubted, that if, in fact, Daniel Dayton returned the sheep in question to the defendant below, or delivered them on the farm to Gideon Dayton as the property of the defendant below, and he recognized that act by accepting the delivery, the right of property in the defendant below became perfect. I think it highly probable that such was the course of the transaction; but I am not at liberty to indulge in *conjectures. Is there legal evidence of this? All that appears

[*759]

is, that the sheep were on the farm Law purchased of Daniel Dayton; but there is no evidence, that the latter did any act for the transfer or the delivery to the defendant below; or that he directed it to be done.

The declarations of Gideon Dayton, before he sold the sheep, that they belonged to the defendant below, that they were left by him to be kept, and had formerly been let to Daniel Dayton, if legal evidence, would well warrant the inference that the defendant and Daniel Dayton had made a settlement on some terms; and that the same sheep, or others in their place, had been returned. But these declarations cannot affect the rights of the plaintiff below, although a purchaser subsequently ;(a) enough not appearing to implicate him in the fraudulent act of the vendor. The plaintiff below cannot avail himself of the declarations of Gideon Dayton; neither can the defendant below. If Gideon Dayton was interested, it was against the defendant below, which was no objection to his (G. D's) competency as a witness for the defendant below. Where one is competent as a witness for the party, the latter cannot avail himself of the confessions of the former. (11 John. 185.)

(a) Phillipps, in his Treatise on Evidence, says, the "admission of an owner is sometimes evidence against one who claims through him." This seems to be an exception to the general rule, which is, I apprehend, against receiving the admission of a vendor to affect the rights of a vendee, though such admissions be made previous to the sale. In trespass *de bonis asportatis*, by *Ivat* against *Finch and another*, the defendants claimed that they had rightfully taken the goods in question upon a *heriot custom*, as the goods of Alice Watson, deceased, the tenant; and the only question was, whether she owned them at the time of her death. To prove that she did not, it was held that the plaintiff might show her declaration, made some time before her death, that she had sold them to him. Mansfield, C. J., said the admission was against her interest; and, had the action been by the plaintiff against her, the admission would clearly be evidence, and ought, therefore, to be received against the defendants whose right depended upon her title. (1 Taunt. 141.) The principle stated here is broad enough to let in such an admission, generally, against all claiming under an owner of personal property, if the admission be made previous to the time when the title of the claimant accrued. But the case itself is of an admission by a *deceased* owner. Her testimony could not be obtained; and her admission was, therefore, to be received as the next best evidence. That such was the principle of that case, is the more probable from a previous *nisi prius* decision, (*Duckham* v. *Wallis*,

So also subsequent declarations by a *party to the sale of property, which go to take away a vested right, are not allowable. (5 T. R. 412.) The confessions and declarations of parties, to the prejudice of the rights of third persons, are insufficient. (14 John. 265.)

The fact that the defendant below, about the time that Daniel Dayton went away, started to go to his house to settle with him, and to get the sheep kept, is a circumstance which, connected with others, might be material; but, alone, proves nothing in relation to an actual settlement, and a return of the sheep. So also the fact that Giedon Dayton called and wanted the defendant below to come and settle with him for the keeping of the sheep, does not touch the question whether Daniel Dayton had delivered them. The claim of Gideon Dayton was solely for the keeping, which might have existed against the defendant, although he. had not been the owner.

I am, therefore, inclined to think there was no evidence to support the proposition, that the sheep in question had ever been set apart by Daniel Dayton for the defendant below, or any act done by the former to make a delivery. If I am correct, in this view, it follows that the charge was warranted ; that if these were not the identical sheep let to Daniel Dayton, the plaintiff ought to recover; for in *that case, if it be admitted that he purchased of a person having no title, his possession could not rightfully be divested by a

[*761]

5 Esp. Rep. 252,) with which it would otherwise be at war. That was an action by the indorsee against the acceptor of a bill of exchange. It was indorsed by Evans, the holder, when over due; so that Evans stood as vendor, and the plaintiff as vendee, claiming no more than Evans' rights. This was admitted; and, to show that the defendant had, while Evans owned the bill, discharged and settled it with him in account, his (Evans') declarations were offered in evidence against the plaintiff. Lord Ellenborough held the evidence inadmissible. He said the fact of the bill having been paid when due, and settled in account, was easily proved by calling Evans himself, or by the evidence of third persons. But what Evans said was not the best evidence, when he himself could be called. It would be making the declarations of a third person evidence to affect the plaintiff's title, when that party was not on the record; and, therefore, could not be received.

stranger; and consequently the judgment below must be affirmed.                    Judgment affirmed.