Casey, C. J.,
dissenting.
I adhere to the opinion-and conclusion stated by me on a former trial of this case, and therefore dissent from the conclusion of the majority in the opinion just read.
The following is the opinion delivered by the chief justice on the second trial of the case, December 9, 1861:
The contract out of which this controversy arises between the government and the claimant, required the latter to furnish all the material and make 221,000 cubic yards of embankment at the navy yard, Memphis, Tennessee, or so much as shall be required of hirti by the engineer, or other duly authorized agent of the government. The embankment was to be made of clay, sand, or gravel, or other good materials, in such manner and places as should be directed by the engineer, or other authorized agent. “ That for the materials and embankment made, approved of, and received and inspected as aforesaid, according to the terms and stipulations of this contract, there shall be paid to the said William Clark, or order, by the navy agent at Memphis, on account of all bills presented for the aforesaid materials and work delivered and executed, made out in approved form, authenticated by the certificate of the inspecting officer or officers, and approved by the commanding officer of said yard, the following price, viz: eighteen cents for every cubic yard.”
It seems clear to me that the thing contracted for by the United States was embankment, and not so many cubic yards of loose detached clay, sand, or gravel. The object and purpose in letting the work *253 was the making of a solid and firm foundation for the site of the navy yard, upon a low wet batture on the bank of the Mississippi river. To be suited to the purpose for which it was designed, it must be sufficiently compact and solid to support the buildings intended to be erected upon it, and prevent an overflow of the river upon the site in high stages of the water. A railroad company contracting for the delivery of materials and making an embankment to raise a depression in the line of their road-bed to. grade, would naturally expect to receive, and the contractor to make, such a permanent solid embankment as would support the superstructure of the road with the passage of the cars over it. If it were embankment for a canal, it would just as naturally imply that it should be of such closeness and texture as would confine the water within the limits of the improvement. In neither case would the contract be fulfilled by delivering so many cubic yards of sand or gravel as there should be of embankment when finished. It is not for the delivery of so many yards of material, but for the furnishing the material and the malting of so many yards of embankment.
But, as I read the contract, it appears to me that the construction is plain and manifest that it was embankment and not materials which the government contracted for. In the contract it is expressly provided that he is to “ furnish the material and make the embankment.” And he is to bo paid “for the aforesaid materials and work delivered and executed,” arid “ for the materials and embankment made.” Now, I cannot think that these engagements would have been met' by the delivery of the specified number of yards of material any more than an agreement to furnish the material and construct a hundred perch of stone wall would be fulfilled by delivering on the grounds of a hundred perch of stone. And in the one case, as well'as in the other, it was to be measured by the work that was done, and not by the materials supplied for its execution.
But it is contended, that if it was to be measured in the embankment, it was to be so measured at the end of each month, and that thenceforward the loss in the embankment from the settling of the materials, shrinkage, waste, &c., was to be borne by the government, and'not by the contractor; and this has given rise to the discussion whether it was an entire or severable contract. In other' words, whether it was one contract for two hundred and twenty-one cubic yards of embankment, or different and distinct engagements for the several parts or portions made in the respective months during the progress of the work. This question is only of any importance in the *254 cause, as it may aid in determining upon whom the loss occurring from shrinkage of the embankment by the action of rain and the river should fall — whether upon the government or the contractor. In a careful examination of this contract, I have failed to discover any provision in it which bound the government to monthly or any other intermediate estimates and payments. That the engineer and commandant of the yarda portion of the time.adopted monthly periods to furnish the contractors with an estimate of the work performed, and authenticated bills for him, by which he was enabled to. receive pay as his work progressed, was to him a matter of favor and convenience, but, as I apprehend, not a right'uudcr the contract. In most of the agreements for the execution of public work it is-usual to insert a clause providing for monthly estimates, but it is entirely omitted in this agreement. The only part of the agreement upon which such a claim is based is that clause which provides that “ ten per centum be withheld from the amount of all payments on account thereof, as collateral security, in addition to the bond.given to secure its performance, and not in any event to be paid until it is in all respects complied with; and ninety per centum of the amount of all deliveries made will be paid by the said navy agent within thirty days after bills duly authenticated, as aforesaid, shall have been presented to him.” It will be seen that no time for taking estimates of the work is specified in the agreement, and the officers in charge of the work might as well have adopted any other period, say quarterly’or half-yearly periods, as monthly estimates. But, did the agreement even contain a clause requiring monthly estimates and payments, the conclusion sought to be drawn by the claimant would not follow. Where such a provision exists, the intermediate estimates are not regarded as separate admeasurements of the work, but mere estimates of its relative progress. They-are understood, both in England and in this country, to be mere approximations. And the stipulation itself is held to be only equivalent to a provision that the company or government shall, from time to time as the work progresses, advance .a stipulated proportion of the pay for the work which the engineer shall adjudge to be done. (Ranger vs. The Great Western Railway, 27 Eng. L. & Eq. Rep., 35; Redfield on Railw., p. 207, § 116.) Upon the same principle, in The People vs. Benton, 7 Barb,, 209, where an indifferent reference was provided for, in case either party should be dissatisfied with the measurement of the engineer, it was held, that this umpirage only extended to the final estimate.
If this be the true rule, the final measurement of the wovk at the *255 completion, of the contract, or stoppage of the work, must determine the,amount of embankment “made and delivered,” and the amount of compensation the contractor was to receive at the rate fixed in the agreement. These views, as it appears to me, dispose of the question upon whom the diminution of the embankment from ordinary causes, as settling and shrinkage, must fall. The contractor can only recover for so much as the final measurement of the embankment shall show to have been “ made and delivered.”
By whom such loss and destruction as occurs from inevitable accident, as by inundation, during the progress of the work, is to be borne, is a question of greater difficulty, and one upon which neither the elementary writers nor the adjudicated cases entirely agree. In the civil law, the owner of the property is liable to the workman for the labor and materials in case of destruction by fire, inundation, or earthquake. (1 Domat., Civ. L., p. ISO.) In the common law, in the ease of personal property the law appears to be settled, that if the employer furnishes the material and the workman is to manufacture an article, as a carriage, or a ship, for a certain price, and the thing perishes before completion and delivery, the owner loses the materials, and whether the workman loses or is to be paid for his labor depends somewhat on the contract, or usage, or on the nature and character of tlie employment. If the workman is to furnish the materials and the work the loss is to be borne by him, for there was no ownership in the employer until completion and delivery; and resperit domino. (Story on Bail, § 427 a.)
Mr. Bell, in his commentaries, deduces the following rules: “ 1st. If the work is independent of any material or property of the employer, the manufacturer has the risk, and the unfinished work perishes to him. 2d. If he is employed in working up the materials, or adding his labor to the property of the employer, the risk is on the owner of the thing with which the labor is incorporated.” 1 Bell’s Com., p. 456, 5th ed.) The principles, as stated above, are much discussed and recognized in the cases of Menetone vs. Athawes, 3 Burr. Rep., 2592; Gillet vs. Mawmen, 1 Taunt. Rep., 137; Gregory vs. Stryker, 1 Denio, 628; Hurd vs. West, 7 Cow. 752; Smith vs. Clark, 21 Wend., 83; Pierce vs. Schenck, 3 Hill, 28; Baker vs. Woodruff, 2 Barb., 520; S. C. 2 Comst., 153; Mallory vs. Willis, 4 id., 76.
With regard to personal property the law appears now to be pretty well settled, but where thfe subject-matter' of the contract relates to the erection of buildings or other structures upon real estate, there appears to be more doubt and difficulty. There, the materials and *256 labor having been affixed or added to the real estate of the employer, it would appear inconsistent with the nature and character pf that species of property that any ownership should reside in the builder or contractor. He has a bare right or license to enter for the purpose of his employment, the legal possession and seizin, in the meantime, remaining in the owner. It is clear, therefore, that the question, whether it is a sale or bailment, cannot arise. The authorities I have ' cited above, and the cases of Woods vs. Russell, 5 B. & A., 942, and Clark vs. Spence, 4 A. & E., 448, discussed on the argument, have no direct or authoritative bearing on the question involved. It must, therefore, be determined on other principles. And, in this aspect of the case, it appears to me that the question whether the contract was entire or severable becomes important. I have already stated, in regard to the measurement, that I hold this to be a contract for 221,000 cubic yards of embankment, and not so many distinct and different engagements as there were months employed in its execution. A contract embracing several particulars, though made at the same time, and contained in the same instrument, may yet have the nature and operation of several different contracts. (2 Smith Lead. C., p. 45.) As where it embraces a number of distinct subjects which admit of being separately executed and closed. (Perkins vs. Hart, 11 Wheat., 237; 6 Curtis, 578.) “ Even if the work was to be paid for as it progressed, it would not show that the contract was distinct and severable. As the sale of 100 bags of hops, at 56 shillings per hundred pounds ; or to serve for 10 months and spin yarn at three cents per run ; or to serve for 12 months at ten dollars per month. (McMillan vs. Vanderlip, 12 John. Rep., 65; Davis vs. Maxwell, 12 Metc., 286; Clark vs. Baker, 5 id., 452.) In a contract to build and complete a house, the employer to pay certain sums respectively when the walls should be raised, the roof put on, and when ready for painting, and the residue when finished ; or a contract to build a bridge at a stipulated price per lineal foot; the erection of a wall at so much per perch ; or the excavation of a section of canal; or the making of an embankment by the cubic yard, and to be paid a stipulated proportion while the work is in progress. In all these cases the contractor, though to be paid by instalments, and by estimates as the work advances, has engaged to finish an entire thing. (Cunningham vs. Morrell, 10 John. Rep. 303; Tompkins vs. Elliot, 5 Wend, 496; Bean vs. Atwater, 4 Cow., 4; McLano vs. Rush, 9 Dana, 64; Redfield on Railw.; McKnight vs. Dunlop, 4 Barb. S. Ct., 36.) And where he is to furnish the materials as well as perform the work, and the work perishes by *257 inevitable accident, without any default on the part of the employer, it appears to me the loss will fall upon the contractor. If the house before being finished should be sonsumed by fire, the bridge prostrated by a storm, or the embankment be swept away by an inundation, although paid a rateable proportion of the work, before he could recover for the entire thing he would have to replace the structures. Two cases contained in our books are almost, if not altogether, in direct opposition to each other. In Wilson vs. Knott, (3 Humph. Rep., 473) Knott was to build a house for Wilson at so much per square foot, to be measured when finished, Wilson to furnish the materials. When nearly completed the house was consumed by fire. The supreme court of Tennessee held that Knott was entitled to be paid for his labor. It is admitted by the judge who delivered the opinion in that case that if the materials had belonged to the workman the law would have been held differently. On almost .the identical state of facts in Brumly vs. Smith, (3 Ala. Rep. N. S., 123,) it was held that the workman was not entitled to be paid for his labor; that the materials perished to the owner, and the work to the builder. As Clark was not only employed to perform the labor, but to furnish the materials and construct and complete an embankment, to consist of one entire thing, containing 221,000 cubic yards, or so much of it as should be necessary, that contract was not performed until he presented such an entire thing, or was relieved or excused from its fulfilment. It was, therefore, necessarily at his risk, and what was lost by the overflow of the river, without any fault of the government or its agents, must be borne by him, and he was only entitled to be paid for so many cubic yards as his embankment measured when he was permitted to suspend the prosecution of the work, with the additions hereafter stated. For this he has been paid in full, and, if there were nothing else in the cause, it would determine that nothing is due to the claimant.
But there are two facts in proof in the case which satisfy my mind that the measurements made do not give the claimant the full measure of justice to which he is entitled. The first is, that a large portion of the embankment was constructed upon a low,-wet batture on the bank of the Mississippi river, and which yielded very considerably to the pressure of the superincumbent embankment. To whatever, extent it so .yielded, measurements made from bench marks on the bluffs before the work was commenced would not ascertain the true amount of embankment made.
*258 Secondly. The evidence shows, that the claimant was required by the officers in the yard to deposit a portion of the material in the water during the high stages of the river, a large portion of which material was of course lost. Under the contract the officers in charge had a right to direct where the material should be placed, but it was a right to he exercised in a just and reasonable manner, and with a due regard to the interests of the contractor. I cannot regard it as either right or reasonable to compel the contractor, during a temporary overflow of the river, to deposit the material in water of from four to eight feet deep, and where necessarily a large portion of it would be wasted and carried away by the current, and for wbat loss he suffered in this way I am clearly of opinion he should be paid. The difficulty is .in the want of reliable and definite proof upon which to found a calculation. In the absence of proof by the claimant I adopt Mr. Warford’s estimate of the diminution of the embankment previously made by the government, and on which he allowed fifteen per centum for shrinkage and waste.
The amount of embankment as measured by the engineer was 12S,913jS(fo- cubic yards, to which I add the fifteen per centum for the depression of the batture and the loss by depositing in the water, making 19,337 cubic yards, and amounting to three thousand four hundred and eighty dollars and sixty-six cents, ($3,480 66,)'to which extent I am of opinion he is entitled to relief, and that a bill for that amount should be reported in his favor.