Mr. Justice Clayton
delivered the following opinion.
This cause is one of great importance to the parties, on ac *537 count of the magnitude of the interests involved, and it has been argued with great zeal and ability.
On the loth of November, 1837, a written agreement was entered into between Thomas Hudnall and N. & J. Dick & Co., which recites that Dick & Co. are in advance to Hudnall, and are responsible for him by indorsements and acceptances. to an amount supposed to be about $150,000. Hudnall on that day agreed to pay that debt in instalments, $30,000 out of the crop of cotton of that year, and the balance in four other equal annual instalments, the last falling due in 1841. The notes were to be made payable at Canton in bank, and to bear eight per cent, interest until paid; and to secure the debt, Hudnall agreed to execute a mortgage on his home tract of land, containing two thousand acres, and on one hundred slaves, to include eighty working hands; and Dick & Co. agreed to take up all the papers on which they were indorsers or acceptors for him. This agreement was made at Nashville. On the 6th of March, 1838, this agreement was carried into effect, and Hudnall and wife executed a mortgage to N. & J. Dick & Co. on their plantation and ninety slaves, to secure N. & J. Dick & Co. in the payment of $175,000 in instalments, running from November, 1838, to February, 1844. This increase of indebtedness seems to have arisen from the extension of the time of payment, and the addition of interest to the notes up to the time of their maturity.
Matters remained in this situation until the fall of 1839, when H. R. W. Hill and James Dick, two of the firm of N. & J. Dick & Co. made a visit to the residence of Hudnall in this state, and ascertained that heavy suits were pending against him, which would ripen into judgments during the fall courts, and cover his property. They, therefore, determined to get an additional mortgage on Hudnall’s other property, and made efforts for that purpose. Hudnall declined giving such mortgage, but finally, without the wish or request of Mr. Hill, who was staying at his house and managing the claim of N. & J. Dick & Co., gave two notes, with J. B. Slade as his surety, in lieu of two embraced in the mortgage, for the aggregate sum of $64,000, payable on 1st February, 1842 and 1844, respectively. To indemnify *538 Slade, he executed a mortgage to him on all his property, except his watch and pencil. This was on the 10th of November, 1839. The property consisted of one thousand nine hundred and fifty acres of land, about one hundred and twenty-six slaves, seventy-five mules, two horses, two carriages, one pair gray horses, one hundred and fifty head of cattle, twelve yoke of oxen, six wagons, two water carts, one hundred and seventy ploughs, five hundred hogs, fifteen thousand bushels corn, two hundred stacks fodder, seven thousand bushels of potatoes, and all his household and kitchen furniture and farming utensils. The deed also provided, that until default in the payment of the notes as they respectively became due, Hudnall should remain in possession of the property, and use so much of the provisions and stock as might be necessary.
Shortly after the execution of this mortgage, Hudnall became uneasy, lest the judgments which might be rendered against him, should be levied on his equity of redemption in the mortgaged property. He was' advised that this might be done, and the advice made a strong impression on his mind. He became anxious to sell all his property, and frequently offered it to Mr. Hill, who declined the purchase. He then wrote to Mr. Douglass, his brother-in-law, and who resided at Louisville, Kentucky, to prevail on him to become the purchaser. Douglass came down, and on the 18th of December, 1839, bought the whole property embraced in the two mortgages. The consideration expressed in the deed to Douglass, was the agreement by him to pay all the debts due to N. & J. Dick & Co., secured by the two mortgages, and the further sum of $24,000, acknowledged to have been paid in cash. This latter sum was in fact paid to Dick & Co., and to Haley & McDowell, by the sale of forty of the negroes embraced in the conveyance. This sale had been made before the purchase by Douglass, and was merely ratified by him, though a bill of sale was made by him, after the conveyance to him.
'Very soon after the sale, Douglass returned to Louisville, leaving Hudnall in possession, without any apparent change of ownership, and leaving him a power of attorney to act for him. *539 Douglass continued to reside in Louisville till December, 1841, but disposed of the crops raised on the plantations.
After the purchase by Douglass, Hill transferred the notes of Hudnall to the Merchants’ Bank of New Orleans, and those of Hudnall and Slade to the Union Bank of Tennessee, with the benefit of the mortgage. Douglass afterwards proposed to execute his notes to these banks, as collateral to the others, upon obtaining an extension of the time of payment, leaving the mortgages still in/ force. This proposition was accepted, and was complied with by Douglass. His liability thus became transferred from Hudnall to the banks.
The Bank of Virginia, and the other defendants in this case, recovered judgments against Hudnall in 1841, and caused executions to be levied upon a part of the negroes conveyed in the second mortgage. This bill was filed to enjoin the sale, and the creditors insist upon their right to sell, because of alleged fraud in the mortgage to Slade, and in the sale to Douglass. The case, therefore, turns entirely upon the question of fraud.
None of the property contained in the first mortgage was seized under the executions; consequently, we are not called upon to pass upon its validity; nor have we any concern with it, except as it tends to elucidate other parts of the transaction.
The prominent objections to the second mortgage are, that it gave an unreasonable length of time for payment of the debt; that it embraced too much property, and contained articles which were consumable in the use.
Almost every mortgage and deed of trust tend, in some degree, to hinder and delay those creditors who are not provided for; but it does not thence follow, that they are of necessity fraudulent. But no unreasonable delay should be interposed. It is difficult, indeed impossible, to lay down any precise and definite rule, applicable in all cases. In general, no farther indulgence should be granted, than the usual time of collecting debts by due course of law. Mitchell v. Beal, 8 Yerg. 134; 3 Hump. 180. Yet there may, perhaps, be circumstances, in which it would not be fraudulent to stipulate for greater delay; as when *540 the debts are very large, the property likewise large, and when the personal exertions of the debtor are also relied on as one means of payment. Bennett v. The Union Bank of Tennessee, 5 Hump. 612. But this point need not now be decided. In such case, no more property must be conveyed than is reasonably sufficient to secure the payment of the debt. Ibid.
In this case the debts were due, and falling due in 1837, which the first deed provides for, and in the agreement to make the first mortgage, the longest period of indulgence expired in 1841. In the mortgage, as executed under this agreement, the day of payment of large sums is postponed until 1842, 1843, and 1844. If the property in the second mortgage had not been more than enough to pay the debts therein provided for, if sold upon a credit until the mortgage debts fell due, the transaction might be of less questionable propriety. In little more than a month after the execution of this mortgage, forty of the negroes were sold by Hudnall either to Hill, the mortgagee, or with his approbation, and the proceeds applied not to the mortgage debts, but to other liabilities. This sale amounted to $26,671. It is true, that all of the negroes so sold were not embraced in the second mortgage, but a part of them certainly were. Of course the security was diminished to that extent, and it shows that the mortgage was estimated to exceed the debt. Hill could have had no other motive of action, because his whole debt was then secure, if the mortgage were valid; to reduce the fund below the point which secured his debt, and again put it in jeopardy, was not the part of prudence or of wisdom.
Simmons, one of the witnesses, estimates the property included in the second mortgage at $94,000 in cash, on the day of its date, about $30,000 more than the debt. The estimates of other witnesses bring about nearly the same result. The law does not permit a man thus to lock up an excess of property, under the pretext of securing one of his creditors.
The mortgaging of property, the use of which involves its consumption, is an evidence of fraud, not indeed conclusive, but of much weight. Unless it be explained satisfactorily, it must cause the condemnation of the instrument, and it imposes the *541 burthen of proof upon those claiming under such instrument; and when the right to use it is also reserved in the mortgage itself, ibis fraudulent upon its face. Somerville v. Horton, 4 Yerg. 541; Charlton v. Lay, 5 Hump. 496.
In this case, one of the debts secured by the mortgage, did not become due until twenty-eight months after its execution, and the other until more than four years. The corn, the fodder, the potatoes, and perhaps other articles, would be destroyed in much less time. It is thus very manifest that the object was not to apply these things to the payment of the debts, but to secure the debtor in their possession and enjoyment. The reservation in the conveyance of so much of these articles, as was necessary for the support of the property, puts an impress of fraud upon it, from which there is no escape. It was a direct benefit secured to the debtor at the expense of his creditors, which the law does not sanction. We therefore come to the conclusion, that this second mortgage cannot be sustained.
But it is insisted in argument, that even if this mortgage be void, still Douglass, as a bona fide purchaser, is not to be affected thereby. We reserve the consideration of this question, until we examine into the validity of the purchase made by Douglass. It has been earnestly assailed in argument, and the objections demand a careful examination.
According to the testimony, Hudnall was greatly attached to his property, and extremely averse to parting with it. His feeling in this respect was almost morbid. When Hill’s proposition for farther security, by way of another mortgage, was first made to him, he refused to accede to it; but he very soon afterwards conveyed his whole remaining unencumbered estate to a friend and neighbor, to induce him to become his surety for a part of the debt of N. & J. Dick & Co., due in something more than two and four years respectively, stipulating for possession by himself in the mean time. This had scarcely been done, when he resolved to procure a purchaser for the whole property, because of a fear that the equity of redemption, together with the possession of his estate, would be taken from him by the judgments of his creditors. A purchaser was sought for, not in the *542 neighborhood where the property and its value were known, nor by public notice to bring purchasers together, nor by offering it in parcels to suit the ability of men of moderate means; but by a letter to a brother-in-law, residing at a distance of some six hundred miles. Mr. Douglass, the brother-in-law, promptly came in compliance with the summons, and the treaty of purchase was in a short time concluded. If the object had been to sell the property for the best price, for the benefit of all concerned, and not to secure some advantage either to Hudnall or his family, or to some relative, it is difficult, if not impossible to assign a reason for such a course of conduct. Soon after the sale, Douglass returned to Kentucky, leaving Hudnall in possession of the property, with so little appearance of change in the management of the estate, that the overseer upon the premises did not know of the sale for more than a year afterwards.
A man in failing circumstances has the right to sell his property, if unincumbered, and apply the proceeds to the payment of preferred creditors, but such sale must be free from fraud, and for a full and adequate consideration. Whilst the circumstances of this case already adverted to, throw suspicion around it, still if, upon careful examination, the sale come up to these requisites, it may overcome the presumptions against it. The inquiry will still remain, whether Douglass is unaffected by the fraud in the second mortgage.
The purchase has been assailed on one side, on account of the alleged inability of Douglass to comply with such a contract. On the other, his pecuniary ability has been asserted, and much testimony has been taken in regard to his condition in life. It is in proof that he was in prosperous circumstances, that he had just been appointed post-master in Louisville, with an income of $3,000 or $4,000 per annum, and that he could command credit to a large amount. That he had much cash capital, is not in proof, and it would seem that the products of the property purchased were mainly relied on as the means of payment. The $24,000, acknowledged in the deed to have been paid in cash, was paid by a sale of a part of the negroes. In December, 1840, he proposed to the Merchants’ Bank of New Orleans, to *543 which the notes of Hudnall for upwards of #60,000, secured by the first mortgage, had been assigned by N. <fc J. Dick & Co., to give his own notes as collateral, if the bank would divide the debt into eight annual instalments, extending to February, 1849. This proposition was accepted and carried into effect. In February, 1841, he proposed to the Union Bank of Tennessee, the assignee of the notes of Hudnall and Slade, included in the second mortgage, to give his notes as collateral, if the bank would divide the debt into instalments, extending from February, 1844, till February, 1851, and would moreover advance him $6,000 cash in New Orleans funds, to be secured by mortgage upon a house and lot in Louisville. This arrangement was likewise made. In each instance, the liens of the mortgages were still kept in force. Hill, in his deposition, says that his assurance to Douglass, that the time of payment should be extended, and the probability of working out the property, contributed largely to his determination to purchase. All this goes to show, that whatever other resources Douglass might have had, it was not his purpose to apply them to the payment of these debts. The design was to obtain time enough to enable him to pay for the property by the crops. Eight years were thought by Simmons, one of the witnesses, to be enough for this purpose; but upon part of the debt he procured ten.
The terms of the deed did not make him directly responsible to N. & J. Dick & Co., as the creditors of Hudnall; his promise was to Hudnall. Hence on the day after his purchase he addressed a letter to Mr. Hill, proposing to become bound for the notes of Hudnall and Slade directly to Dick & Co., a proposition which was afterwards modified and consummated with the Union Bank of Tennessee, the assignee of those notes. This points to the conclusion, that he did not intend to become personally bound to the creditors of Hudnall, except upon terms which, in his opinion, would enable him to make the property pay for itself, and this conclusion is strengthened by the fact, that, upon the completion of the contract, he gave no obligation to the creditors for payment. It may hence be deemed doubtful whether, under the contract with Hudnall, Douglass intended to *544 pay out of his own funds, or entirely out of the proceeds of the property which he purchased. And there is nothing disclosed in the testimony on this head, which especially recommended him as a purchaser for so large an estate, or from which any just argument can be drawn in support of the validity of the sale.
Another circumstance of some weight is, that Hudnall, after the execution of the mortgage to Slade, and after he had been advised that his equity of redemption could be sold under execution, told his son-in-law, Walker, that he would make an absolute conveyance of his estate to some one who would hold it for him; that he thought Douglass would do it, and that he would write to him for the purpose. It has been sometimes questioned, especially in New York, whether evidence of the declarations of the vendor, previous to the sale is admissible against the vendee. Paige v. Cagwin, 7 Hill, 381; Hurd v. West, 7 Cow. 752. This is held upon the ground, that the vendor might himself be called as a witness. But far the greater number of cases hold, that the admissions of the owner may be evideuce against one who claims title through him. 2 Stark. Ev. 48; 2 Phil. Ev. (Cow. & Hill’s notes) 648, 656; Hatch v. Dennis, 1 Fair. 248; Weidman v. Kohr, 4 Ser. & Raw. 174; 9 Dane, Ab. 301. These last decisions seem to us to stand on just principles, and we give our assent to them. Only those declarations are to be admitted, however, which were made before the party divested himself of his interest. Nor will they affect the vendee, if he had no notice of them, and his purchase in other respects be free from objection. Astor v. Wells, 4 Wheat. 467; Guidry v. Grivot, 2 Mar. La. Rep. N. S.; Garland v. Rives, 4 Rand. 282. There is no positive evidence, that Douglass had knowledge of these declarations; notice must be inferred, if at all, from circumstances. The use to which a deed is applied tends to show the intent with which it was made. 1 Burr. 484.
To rebut the presumption of fraud, the argument mostly relied on is, that a full price was agreed to be paid for the property. Certainly that is a circumstance, if it be true, which *545 tends to repel the inference, and to show that the transaction was fair. Callen v. Thompson, 3 Yerg. 475; Maney v. Killough, 7 Ib. 440. Yet if a purchaser knows when he takes his deed, that the object of the grantor is to defraud creditors, the deed is void, though he may give a full consideration. Worseley v. De Mattos, 1 Burr. 474; Edgell v. Lowell, 4 Verm. 405. In Twyne’s case, the consideration was more than sufficient and undoubtedly true. Where a conveyance may hinder and delay creditors, it is not for that reason alone void, if it were made with a proper intent. But it becomes void when the main intent is to hinder and delay creditors, and the conveyance a contrivance for that purpose. Wakeman v. Grover, 4 Paige, 23.
That Douglass may have the full benefit of the circumstance, that he paid a fair price, if it be found to exist, it becomes necessary to inquire into the adequacy of the consideration.
The price assumed to be paid for the whole estates, according to the recital in the deed, was the debt due to N. & J. Dick & Co. amounting to $134,647-65
Cash, 24,000-00
$158,647-65
This is the amount stated in the deed, of the consideration ; but the bill states that it was also the understanding of the parties, that Douglass was to pay all liens on the property. These judgment liens may be put down in round numbers at $30,000, making the whole consideration $188,647.
The number of negroes conveyed was about two hundred and sixteen; of whom one hundred and fifty-five were working hands; seventy-four males, eighty-one females, and the balance children. In regard to the value of slaves at the time of the sale, the opinions of the witnesses vary very much. Hill says they were worth $1200, or $1500 a pair; on a long credit nearly, if not quite, fifty per cent. more. Hoover says, men were worth $800, and women $600. Perkins places their value in gold and silver at $600 each, and Old puts men at $700, and women at $550. Simmons values the whole property conveyed at $167,700 cash. Prewitt says, men were worth from $800 to $1000, women *546 from $500 to $700, and children from $150 to $200. The sheriff and deputy sheriff of the county put a lower estimate upon them, but they drew their conclusions from execution sales, which are hardly to be trusted as tests of the market value of property.
There is one fact in the record, which throws light upon this point. There were forty of the negroes sold by Hudnall to Hill and others, a little before the date of the sale to Douglass, and the sale was ratified by Douglass. For these the sum of $26,571 was paid, as appears by the receipts, being an average of $656 each. Of the same forty, Haley & McDowéll took twelve at the price of $7646.80, an average of $637 each. There is nothing to show, that these negroes differed in value from the rest, or that they were not of average quality. The witnesses also differ, as to the addition to be made to the cash price, on account of the long credit which was given; twenty-five per cent, seems to be near the medium.
Two witnesses speak of the value of the personal property, other than the slaves; the one places it at §28,000, the other at §23,000; in the absence of any better criterion, we fix on the middle point between them. There is still less harmony of opinion in regard to the value of the land. The estimates are from eight to fifteen dollars per acre; and the rate put upon it by Simmons must have been higher, though he speaks of it in the aggregate. In the midst of such discrepancies, and with no better data on which to rely, our best course seems to be to adopt a nearly medium price.
By this standard, the one hundred and fifty-five hands were worth §670 each, $103,850
Sixty-one children, at $175, 10,675
Addition for length of credit, 25 per cent. 28,631
Personalty, other than slaves, 25,000
Three thousand four hundred acres of land, at $10, 34,000
$202,156
This price exceeds the sum agreed to be paid by $13,500. In so large a purchase, especially where the evidence is so contradictory, this difference would not, of itself, induce us to set aside a sale.
*547 Here, then, are arrayed the prominent facts and circumstances for and against this transaction. On the one side are the features already adverted to, which show fraud in law in the Slade mortgage; the expressed determination of Hudnall to make conveyance to save his property, the conveyance of his whole estate, the subsequent retention of possession for two years, the relation between the parties, the knowledge of Douglass of the embarrassed condition of Hudnall, the strong probability that he knew Hudnall’s intent, and the fact that his undertaking was to pay only the liens already subsisting on the property. To which may be added the fact, that Douglass was specially written for on the occasion. We extract a part of Mr. Hill’s testimony, bearing on this point, which tends to illustrate the position of the parties : “ Captain Hudnall was advised,” says Mr. Hill, “ that the equity of redemption could be sold for any trivial execution, and he was of opinion he could and would be dispossessed, and all hope of saving ultimately his property be lost. Fearing such difficulty, I was eadeavoring to protect him against such debts, and proposed to purchase, and did so, about $18,000 worth of his negroes, and was to pay that amount of his debts. During this period, he informed me, he thought he could prevail on George L. Douglass of Louisville, to buy the estate. I encouraged the sale; he wrote, as I understood, to Mr. Douglass, who came down while I was there; when the whole of Mr. Hudnall’s affairs were looked into by Mr. Douglass, who is a shrewd business man, and the conclusion he came to, as well as myself, was, that Hudnall’s liabilities were greater than the value of his estate. This information appeared to shock Captain Hudnall very much.”
Thus stood the parties; Hudnall, shocked at his condition, yet clinging to the hope of ultimately saving his estate; Hill, anxious to save his own debts, and endeavoring to protect Hud-nall against trivial executions; and Douglass, called in to aid in this emergency.
On the other hand is the fact, that the price agreed to be paid is very nearly the value of the estate, if not fully, and the testimony of Mr. Hill, that the transaction, to which he was privy throughout, was in his opinion fair and honest.
*548 If this were the sole point, the court might well pause before it came to a decision. We pass to the remaining question: Is Douglass a bona, fide purchaser for valuable consideration without notice ? In other words, if' the second mortgage be void, is the property protected from judgment creditors, in the hands of Douglass, by reason of his purchase ?
The statute of frauds in this state, is not more favorable to purchasers under conveyances alleged to be fraudulent, than the English statute of Charles II. or those in force in our sister states. It seems to be a settled construction of these, that if the vendee be a bona, fide purchaser for a valuable consideration, without notice of any fraud in ,the vendor, he will be protected against creditors; but not if he have such notice. Edgell v. Lowell et al., 4 Vir. 412; Bridge v. Eggleston, 14 Mass. 250; Worseley v. De Mattos, 1 Burr. 474; 4 Kent, Com. 464.
What constitutes notice is very clearly laid down in Jones v. Powles, 3 Mylne & Keene, 581. The purchaser is protected only when he has paid a valuable consideration, and could not have discovered the defect by reasonable diligence.
Let us see the precise condition of Douglass in reference to this matter. “ In his bill he alleges, that on the 18th of December, 1839, he became the purchaser of the said lands, slaves, and other property in said two mortgages mentioned, together with other property, subject to said two mortgages, and the amount then due on the same, and assumed upon himself the payment of whatever might be due on said mortgages, together with the sum of $24,000, mentioned in the deed from Hudnall to him.” He thus purchased an estate conveyed by a mortgage, fraudulent as to creditors upon its face. He assumed the payment of the debts mentioned in that mortgage. He did not pay a dollar of his own funds. He gave no obligation for payment to the mortgage creditors, but virtually stepped into the shoes of Hudnall, and occupied his place. He is, therefore chargeable with full notice, and his purchase affords him no protection. If fraudulent on the part of Hudnall, it is equally so as to Douglass. We look to the situation of the parties at the time the conveyance was made; not to subsequent changes. If no *549 alteration had been made in his assumpsit by Douglass, if the mortgage had been declared void for the fraud of Hudnall, Douglass would have been released from responsibility to Hud-nall. If he has since placed himself in a position, in which he^ cannot render such defence available, the rights of the judgment creditors are not to be affected thereby. He stands as the representative both of the rights and the liabilities of Hudnall; and the property is subject to these judgment creditors, as if no sale had been made.
It is not our purpose to say that Hill intended to commit a fraud. His object was to secure his debt, and he pursued it with untiring energy. But Hudnall was an intractable subject. He made his own mortgage in his own way; and Hill had to take it, as he found it, or to take nothing. It is his misfortune, that the mortgage to Slade contained provisions which rendered it fraudulent upon its face. But the uprightness of his intentions cannot alter the law. This court has, therefore, decided' in regarded to deeds of trust, that the innocence of the crédito of any evil design, will not aid a deed rendered fraudulent by by the acts of the debtor. Harney v. Pack et al. 4 S. & M. 229.
The counsel for the Union Bank of Tennessee insist, that the bank, as the assignee of the notes of Hudnall and Slade, by N. & J. Dick & Co., is not to be affected by any fraud in the transaction between the other parties. It took the notes and the mortgage made to secure them, just as they were in the hands of Dick & Co. The fraud upon the face of the mortgage was notice to them. Even if the bank never saw the mortgage, it stands affected with notice of every fact, apparent on its face; because the exercise of the' requisite diligence would have discovered the defect.
Some time after the purchase of Douglass, on the 16th of February, 1841, the . bank, without any advance of a new consideration, received the notes of Douglass, as collateral to those of Hudnall and Slade, and extended the time of payment, retaining, however, the lien of the mortgage. This arrangement did not strengthen their hold, on the mortgage. If previously void, this did not make it valid. Whether the notes of Douglass *550 to the bank are not obligatory upon him, is a matter not. before us, and which cannot enter into our consideration.
The decree of the chancellor, making the injunction perpetual is reversed, the injunction dissolved, and the bill dismissed.
Mr. Justice ThacheR.
Upon full examination, I concur in the foregoing opinion, and concluding decree.
Mr. Chief Justice Sharkey
delivered the following opinion.
The prominent facts in this case have been accurately stated in the leading opinion, and need not be particularly noticed by me, further than may be necessary to illustrate my own view of the case. In that opinion, the question is treated very much as it was argued, as a sale of property, real and personal, in regard to which a controversy has arisen between the purchaser and creditors of the vendor. Viewed in that light, I yield my hearty concurrence in the conclusion of that opinion, and in the main, to the views and reasoning which led to that conclusion.
But an aspect of the case, somewhat different, presses itself with great force on my mind, and for that reason alone it is perhaps proper that I should express it, although it leads irresistibly to the same conclusion.
Hudnall, it seems, was largely indebted to Dick & Hill, and to secure them, 'mortgaged directly to them a large amount of property, consisting of one of his plantations, the negroes and stock thereon. This was in March, 1838. In the fall of 1839, Dick & Co. had ascertained that Hudnall was much embarrassed, and that suits were pending against him to a large amount. Thinking their security a slender one, they importuned Hudnall to give them further security by an additional mortgage on other property. This he positively refused to do, but marked out and followed a plan of his own, regardless of their desire in the matter. For part of the debt due them he executed two notes, amounting to $64,000, on which he gave the defendant, Slade, as personal security. To secure and indemnify Slade, he executed a mortgage to him of another plantation *551 with the negroes, &c. thereon, worth, as it is said, $94,000. This last mortgage covered all his property in Mississippi that had not been conveyed by the first mortgage. As matters now stood, Hudnall had nothing more than an equity of redemption in any of the property. Being advised that such right was subject to be sold for his debts, and that he would thereby be dispossessed, he became uneasy, and" determined to sell out. He accordingly wrote to the complainant, then a citizen of Louisville, Ky., who very soon afterwards came down. The affairs of Hudnall were looked into, the incumbrances disclosed and investigated, and the complainant became the purchaser, taking from Hudnall a deed of conveyance of all the property covered by both mortgages, in which the consideration expressed is, that Douglass had assumed and taken upon himself the two mortgaged debts, and for the further consideration of $24,000. But no other obligation was given for the payment of these debts than that contained in the deed. Nor was the sum of $24,000 expressed in the deed, either paid or agreed to be paid by Douglass. That matter is thus explained by the testimony. Previous to the contract with Douglass, Hudnall had agreed to sell to Hill and to Haley &. McDowell part of the mortgaged property, sufficient to amount to that sum. Douglass agreed to carry out Hudnall’s contract, and did so by conveying the negroes in accordance therewith. This additional sum of $24,000, expressed in the deed, is a matter of but little consequence, but it is as well briefly to dispose of it. Hudnall had but an equity of redemption in the negroes so agreed to be sold. If he had made a valid contract to sell that interest, Douglass acquired no right whatever; and it seems that it was part of the agreement that Hudnall’s contract .should be fulfilled. The substance of the agreement was then, that for Hudnall’s interest in the balance of the property, Douglass agreed to pay the mortgage debts.
The first mortgage may be passed by; its validity is not contested ; and the property levied on by the judgment creditors is embraced in the second mortgage, the validity of which is contested.
*552 Assuming, for the present, that both mortgages are valid, what did Douglass buy? He purchased nothing more than Hudnall’s equity of redemption, for, at most, that was all he had to sell, and it is immaterial whether the contract was fraudulent or bona fide. By no possible form of conveyance could he convey more. It perhaps may be a question whether he could convey any thing more than his mere tenancy, as it has been very much doubted whether there is an equity of redemption before condition broken. But allow that he did purchase the equity of redemption, the legal title is in the mortgagees. The equity of redemption is all that he claims in his bill, as that is urged as a reason for his right to resort to a court of chancery.
As to the equity of redemption, then, and as to that alone, Douglass stands precisely in Hudnall’s place. He cannot be in a better condition than Hudnall; and if he should fail to get as much as he thought he was buying, that is a question between Hudnall and himself. As against the mortgagees he has a right to redeem; but it would be strange, indeed, if his right should cut out incumbrances to which the property was liable, both as against Hudnall and Slade, when he purchased Avith notice of such incumbrances. Yet this position must be maintained before Douglass can succeed.
Let us see, then, to what incumbrances or liabilities the property was subject. The mortgage to Slade was valid as to Hudnall, for though it may have been made to defraud creditors, it was still valid as between mortgagor and mortgagee. It was consequently valid as to Douglass. But it was clearly void as to the creditors of Hudnall, first, for fraud in fact; for two of the witnesses state that both Hudnall and Slade had declared that it was made to protect Hudnall’s property against a debt due to the United States, and against security debts; and, secondly, it was void 'for fraud in law apparent on its face. Then neither Hudnall nor Slade could set up this mortgage against creditors; that is certainly too clear to admit of dispute. How is Douglass to do so? He took but Hudnall’s right, subject to all incumbrances or liabilities of which he had notice. He had full notice of the invalidity of the Slade mortgage; It is *553 referred to in the deed to him, and notice of a deed is notice of its contents. 2 Powell on Mort. 563. The purchaser of an equity of redemption holds subject to all incumbrances of which he had notice. Ib. 551. It would not, perhaps, be straining-too much to say that Douglass must have had notice of the fraud in fact in this case before the payment of the purchase money, and that is sufficient. 4 Kent, 180. The circumstances were such as to put him on inquiry, and whatever puts a party on inquiry, amounts in judgment of law to notice. Ib. 179. But it is not necessary that he should have had notice of fraud in fact; the deed was equally void for .fraud in law, and from notice of that he cannot escape. Hudnall then had an equity of redemption under the Slade mortgage, but he could only protect this by removing the claim of creditors, to which the property was liable. The creditors’ claim was paramount. Douglass admits the validity of the mortgage as to Slade, and purchased only Hudnall’s interest or right which grew out of the relation of mortgagor and mortgagee. But he did so knowing that the property itself was liable to creditors. Surely his purchase does not exonerate it from that liability. In what does the case differ from the sale of an equity of redemption, when the property is subject to a prior judgment? In nothing, as I conceive. Suppose that there had been a judgment against Hudnall prior to Slade’s mortgage, Douglass could not claim to hold the property exonerated, from it; and why not? because it would constitute a paramount claim. The property would have been liable for its satisfaction, both as against Hudnall and as against Slade. Suppose another parallel case. Hudnall conveys by mortgage certain property to Slade; in the deed he inserts this condition, “ saving and reserving to every creditor of mine, the right to have his debt satisfied out of this property, 'by the levy of an execution or otherwise.” Slade would then take a property subject to the right of creditors. Hudnall would still hold an interest subservient to the rights of Slade and the creditors. Would any purchaser from Hudnall of his residuary interest with this deed before him, acquire the *554 property free from the rights of creditors? Yet the law has placed precisely that condition in the deed from Hudnall to Slade, and Douglass is a purchaser of nothing more than Hud-nall’s interest, with this condition before him. His title is secondary to, or dependent on, the mortgage, and yet he wishes to cut out claims which the mortgage secures. And it will not do for him to say that he had no notice of these debts. Notice of the mortgage was notice of all its conditions and exceptions, and the party is bound to make all necessary inquiries as to other deeds to which it refers. 2 Powell on Mort. 561-563. He is, of course, bound to know its legal effect.
The record furnishes no evidence that Slade has ever assigned this mortgage to the Union Bank of Tennessee. If he had done so, it would be difficult to maintain that the bank would be in a better condition than Slade, as the defects in the mortgage are apparent on its face. The assignee of a mortgage takes it subject to all equities between mortgagor and mortgagee, (2 Cowen, 247,) and of course subject to all conditions imposed by law.
As to the consideration paid' by Douglass, I need say but little. He was bound only by the deed according to its legal effect, to indemnify Hudnall in case the mortgage creditors should resort to him; nothing’more, as the contract originally stood between them. Whether he becomes personally liable to the creditors, is not now a question.
In any view of the case, then, it seems to me to be so perfectly clear, that the judgment creditors may subject the property covered by the mortgage to. Slade, that the only wonder is, that it has been so much doubted and litigated. I think the decree should be reversed, and the bill dismissed.